UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| United States of America, | \* |
| ex rel. John Doe, | \* |
| | \* |
| Plaintiffs, | \* |
| | \* |
| v. | \* |
| | \* |
| Catholic Medical Center and | \* |
| Boston Scientific Corporation | \* |
| | \* |
| Defendants. | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT FOR DAMAGES PURSUANT TO
## FALSE CLAIMS ACT ("QUI TAM" SUIT)
### Filed In Camera pursuant to 31 U.S.C. § 3730(b)(2)
### JURY TRIAL REQUESTED

Plaintiff, United States ex rel. John Doe, individually, through his attorneys, Douglas, Leonard & Garvey, P.C., and complaining of the defendants, Catholic Medical Center of Manchester, New Hampshire; and Boston Scientific Corporation of Marlborough, Massachusetts; and alleges:

### JURISDICTION AND THE PARTIES

1. This action is brought on behalf of the United States to recover all damages, penalties and other remedies established by and pursuant to 31 U.S.C. §§ 3729–33, through Plaintiff John Doe (the "Relator"), who claims entitlement to a portion of any recovery obtained by the United States as *qui tam* plaintiff in accordance with 31 U.S.C. § 3730.

2.     The Relator, John Doe, is a resident of New Hampshire who files the instant action under a pseudonym to protect his anonymity. His name and contact information have been disclosed to Office of the Inspector General in a confidential complaint detailing the allegations herein dated June 8, 2018.

3.     Defendant Catholic Medical Center ("CMC"), is a domestic nonprofit corporation with a principal place of business located at 100 McGregor Street, Manchester, New Hampshire, and a mailing address of 100 McGregor Street, Manchester, New Hampshire 03102.

4.     Defendant Boston Scientific Corporation is a foreign for-profit corporation with a principal place of business located at 300 Boston Scientific Way in Marlborough, Massachusetts 01752.

5.     As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), the Relator has provided the federal Centers for Medicare & Medicaid Services ("CMS"), through the Office of the Inspector General, with a statement of all material evidence and information related to the Complaint.  This disclosure statement supports the existence of inappropriate charging for Medicare and Medicaid funding and the reliance by the United States Government on claim for said Medicare and Medicaid funding.

6.     Jurisdiction exists pursuant to 31 U.S.C. § 3730(b)(1) and 31 U.S.C. § 3732 inasmuch as this action seeks remedies on behalf of the United States for violations of 31 U.S.C. § 3729 by the defendants and at least one defendant can be found, resides, or transacts business in this judicial district.

7.     Venue is proper in the District of New Hampshire pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTS

### Anti-Kickback Violations

8.     Since at least 2005, leadership in the Heart Institute at CMC has encouraged its physicians to perform procedures in patients referred to CMC by Dr. Mary-Claire Paicopolis. Many of these patients display with marginal medical indications, and in some cases no justifiable indication at all.  Performing these unnecessary procedures cultivated CMC's referral relationship with Dr. Paicopolis, and protected CMC's high procedure volume at the expense of, and with indifference to, patient safety—even patient lives.  For example, at least one patient referred by Dr. Paicopolis suffered renal failure requiring dialysis as a result of resynchronizing an Implantable Cardioverter Defibrilator ("ICD") that was not medically indicated, and another patient died as a result of a cardiac catheterization that was not medically indicated.

9.     Around 2008, after some years of referrals from Dr. Paicopolis, CMC started providing Dr. Paicopolis with weekend and holiday coverage at her practice in the Lakes Region at no cost.  Instead, CMC would pay physicians willing to participate in the scheme a much larger sum ($10,000 per weekend $3000 per night) for providing the service.  In effect, CMC pays its cardiologists above market rate to provide a service of substantial value to Dr. Paicopolis, so that she will return the favor to CMC by

referring patients for procedures with (in some cases) marginal indications, who ultimately bill Medicare.

10. This *quid pro quo* relationship had the effect of CMC giving a prohibited "kick back" to Dr. Paicopolis in the form of no-cost services in exchange for Medicare referrals in violation of 42 U.S.C. § 1320a-7b(b)(1). CMC, in turn, would use the Medicare claim form to seek reimbursement for the service performed on the referral patient, and in so doing would falsely certify that the service was both "medically necessary" and "complie[d] with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute…" knowing that Medicare would only reimburse CMC on the condition that these certifications were true.

11. When a man named Scott Pippin became the local representative for the cardiac rhythm management arm of Boston Scientific, he shrewdly recognized the importance of this relationship to CMC and took advantage of it by "assisting" Dr. Paicopolis in her pacing clinic. Within a few months, representatives from Boston Scientific were performing device checks for Dr. Paicopolis for all implanted pacemakers and ICDs, not just their own company's devices. These checks are performed when the physician is not present, and sometimes when she is off site. Nonetheless, Dr. Paicopolis continued to bill for these services, which are often performed on Medicare recipients. In return, she insisted that CMC implant only Boston Scientific devices in her patients, markedly increasing their market share at CMC. In addition, she insisted that her preferred electrophysiology physician at CMC,

Dr. Jamie Kim, exclusively use only Boston Scientific's Rhythmia mapping system when performing intra-cardiac ablation procedures, once again funneling profit to the company. In effect, Boston Scientific is providing a service for which Dr. Paicopolis bills Medicare, and she pays the company with procedure volume at CMC in violation of the Anti-Kickback laws. This makes her required certification on any Medicare claim form false, and violates the condition upon which Medicare disburses payment.

12. In order to keep CMC from objecting to the limited choices of device and mapping system from Dr. Paicopolis, Boston Scientific offered CMC early access to its Watchman left atrial occluder. The company provided unprecedented support to a non-academic community hospital site. In addition to bringing an advanced team of educators to the center, they brought their most experienced technician, Will Rogers, from Germany and placed him at CMC to support the growth of the program. The two chosen implanters, Dr. Kim and Dr. Connor Haugh, were paid by the Boston Scientific to proctor implants at other centers, to proctor implants of their subcutaneous ICD, and to give paid presentations about the devices at national conferences. Dr. Kim has travelled extensively internationally at Boston Scientific's expense, and according to public reporting has made more than $60,000 per annum as a result of these activities. He currently is the single largest volume implanter in the United States, largely as a result of referrals from Dr. Paicopolis. He also runs the moonlighting program for Dr. Paicopolis, and is her preferred provider for all electrophysiology procedures.

13. In addition to providing proctoring fees to Drs. Kim and Haugh, and developing the Watchman program for CMC, Boston Scientific has provided the

hospital with billing and coding advice, and has negotiated volume targets in ICDs, pacemakers, and ablations in order to maintain the Watchman program.  After paying those two providers in the form of proctor fees, and paying the hospital in billing and coding advice, the company has been reimbursed in device volume.

14.     This arrangement among CMC, Dr. Paicopolis, Dr. Kim, Dr. Haugh, and Boston Scientific violates the Anti-Kickback laws, and the fruits of those violations become Medicare claims, which are made by submitting forms that falsely certify that the Medicare recipient was not procured through illegal kickbacks.

## Medicare Fraud by Manipulating Mortality Data

15.     In the last year or so, Dr. Yvon Baribeau  proposed that medical staff "discharge" patients from the ICU and then "readmit" them to Hospice even though the patients never left their ICU room in an effort to better "manage the numbers" of cardiac deaths at CMC. The ICU nurses began cutting patient name bands given for the surgical hospital stay, and then reapplying a new band with a new hospital number before allowing the patient to expire thereby avoiding the need to claim a surgical mortality.  The patients known to have been "managed' this way are:

| Name | Date of Birth | Medical Record Number | Date of Service | Date of Death |
|------|---------------|-----------------------|-----------------|---------------|
| M. C. | 4/6/64 | 59-49-09 | 1/11/17 | 2/15/17 |
| E. M. | 4/3/32 | 63-31-83 | 8/24/17 | 9/29/17 |
| R. A. | 6/23/47 | 53-03-33 | 7/10/17 | 8/7/17 |

16.     The details concerning M.C. are:

She is a 52 year old woman who had endocarditis and had an atrial valve replacement with Dr. Baribeau on January 11, 2017. She did poorly after surgery secondary to postoperative bleeding and decreased left ventricular function, and it was clear to everyone that she was dying with no chance for survival. According to an ICU nurse (Lauren LaChance), in February it was determined that she was to be made "CMO" (Comfort Measures Only) and allowed to expire. However, since she had never left the hospital and was less than 30 days from her surgery, she was kept alive on vasopressors even receiving blood transfusions for over a week until February 15, 2017, when she was "discharged" from the ICU and her ID band was cut off. Moments later she was "readmitted" to Hospice with a new band and a new number and allowed to die. She never left her ICU room. She essentially was made CMO but the band switch allowed CMC to skirt the surgical mortality rules. This was verified by Erin Latina, the nurse practitioner in the ICU, who said that the plan was proposed by Dr. Baribeau in order to "manage the numbers." The CMC upper administration bought into the idea and promoted the scheme saying that it was necessary because "other institutions were doing this." The orders to discharge and readmit were entered by Cherie LaMotte, APRN and electronically signed by a person identified as "DC."

17.     The details concerning E.M. are:

On information and belief, she had a coronary artery bypass graft surgery on August 24, 2017, and died on September 29, 2017. She was "discharged" from the ICU and her

ID band removed. She was then "readmitted" to Hospice, re-banded with a new number, made "CMO" and allowed to expire.

**Substandard Care Leads to Higher Medicare/Medicaid Billing**

18. The American Medical Association's Code of Medical Ethics is incorporated by virtue of N.H. Admin. R. Med 501.02. Ethics Code Opinion 2.1.3(f) requires that doctors "[d]isclose medical errors if they have occurred in the patient's care…." Despite this directive, CMC has created a practice of covering up medical errors so that they do not reach the patients or their families. Therefore, patients receiving care at CMC, including those covered by Medicare, have gone without learning of medical errors that would enable them to seek remuneration through making a claim against CMC's medical liability insurance or filing a malpractice law suit. This categorically prevents Medicare from ever recovering funds disbursed to cover the cost of the substandard care, which it would be entitled to recover under the Secondary Payer Act. The following examples illustrate this issue:

| Name | Date of Birth | Medical Record Number | Date of Service |
|------|---------------|-----------------------|-----------------|
| L.V. | 10/8/56 | 33-54-59 | 7/16/12 |
| N.A. | 10/21/62 | 03-75-99 | 1/17/13 |
| F.P. | 4/16/39 | 49-49-88 | 9/10/14 |
| V.G. | 9/21/36 | 60-65-98 | 9/10/14 |
| L.M. | 12/29/60 | 05-11-50 | 12/10/15 |
| T.F. | 8/6/92 | 64-45-87 | 5/19/16 |

| Name | Date of Birth | Medical Record Number | Date of Service |
|------|---------------|-----------------------|-----------------|
| J.A. | 8/12/44 | 65-17-79 | 9/9/16 |
| J.R. | 8/19/51 | 52-03-30 | 11/28/16 |
| R.B. | 7/8/58 | 51-06-35 | 5/11/17 |
| M.H. | 1/16/34 | 66-27-09 | 10/29/17 |
| L.E. | 3/19/46 | 67-76-65 | 8/29/17 |
| J.C. | 5/21/50 | 63-15-39 | 11/30/17 |
| R.B. | 11/10/49 | Not available | 3/26/18 |

19.     The details concerning L.V. are:

A 55 year old woman with a history eight coronary artery bypasses in 2008 with angina who returned for a redo coronary artery bypass graft on July 16, 2012, with Dr. Baribeau. All seven grafts were closed except the left internal mammary artery. Dr. Baribeau worked for nearly eight hours then closed the chest and instructed the staff to keep the patient in the Operating Room for observation of bleeding for 30 minutes. The bleeding accelerated and the staff paged and called him. They did finally reach him, but he claimed that he was no longer covering and that he had communicated and "signed out" to Dr. Alexandros Karavas who was now on call. Dr. Karavas was called and stated that he was only on call for the ICU, and not for any Operating Room complications. He also stated that contrary to what Dr. Baribeau had said, he had not spoken with or communicated in any way with Dr. Baribeau. The staff tried to call Dr. Baribeau back but was unsuccessful. Dr. Benjamin Westbrook was ultimately reached

and came in to re-open the patient and repair a hole in the back of the heart. On the Operating Room Nursing Intra-Op Record (compiled by Giuliana Gaudette, RN) the Operating Room start time was 10:30 and the end time was 23:37. Dr. Baribeau's start and end times were 12:14 to 20:39. Dr. Westbrook's start and end times were 22:11 to 23:13. Therefore, it was documented on the Operative Report that from 20:29 until 22:11 there was no surgeon in the Operating Room. In fact, there was no surgeon in the building for nearly one hour and 45 minutes. The patient was profoundly acidotic and expired with hours of arriving in the ICU on July 17, 2012. The Operative Note, dictated by Dr. Baribeau on July 16, 2012, at 21:00, (while the patient was still bleeding in the Operating Room), stated that "the patient was observed a few minutes in the OR then conducted to the ICU." At the Morbidity and Mortality Conference the following month, he stated that the patient was bleeding in the Operating Room and that he "called BMW [Dr. Westbrook] in to assist" him. This case was referred to the New Hampshire Board of Medicine, but the Board reviewers were unable to discern the pertinent facts of the case from the voluminous amount of extraneous data also documented. The Registered Nurse First Assistant was Terry Bouvier who was present throughout the entire case. The following day she was so upset that she spoke with Jack Anderson, the director of the Operating Room. She told him that she was going to report the case to the CMC Risk Manager. Mr. Anderson advised her against this and told her that if she did this, she would lose her job.

20.     The details concerning N.A. are:

A 50 year old man with a dissecting ascending aortic aneurysm.  He had emergent surgery with Dr. Westbrook on January 17, 2013, and transferred to the ICU in stable condition at 15:20.  He began bleeding profusely between 500 to 900 ml/hour continuously.  Dr. Baribeau was the covering doctor and was called repeatedly and told the patient was bleeding profusely.  He did not bring the patient back to the Operating Room.  At midnight, the ICU nurse (Krysten Brooks) called Dr. Baribeau and told him that the patient was now extremely unstable, in shock on multiple vasopressors, and developing cardiac tamponade.  She further stated that he was going to arrest very soon if the patient was not brought back to the Operating Room.  Dr. Baribeau did not come in.  At approximately 01:00, the patient did arrest, CPR was started, and Dr. Baribeau was called again.  Even though he lives 15 minutes from CMC, he did not arrive for nearly 45 minutes.  The patient was taken to the Cardiac Operating Room at 03:20.  The patient did survive the operation and was returned to the ICU around 05:45 in stable condition.  However, he was found to be unresponsive at morning rounds with fixed and dilated pupils.  An EEG was done which was isoelectric and consistent with brain death.  He expired on January 20, 2017.

21.     The details concerning F.P. are:

A 76 year old man presented to the Emergency Room on the late morning of September 10, 2014, with a sudden onset of a cold pulseless leg.  He was seen by Brian Barb, an Emergency Room Physician Assistant who diagnosed an acutely ischemic leg and called for a vascular surgery consult immediately.  The patient was seen by Dr. Stratton

Danes who agreed with the diagnosis, but noticed that the patient had been seen by the cardiac surgeons in the past. Dr. Baribeau was then called and wrote orders and admitted the patient to his service. Dr. Baribeau added the case on to the schedule as a "to follow" case, but failed to tell the Operating Room team that it was an emergency, and instead started an elective coronary artery bypass graft surgery on a retired anesthesiologist. His plan was to do the ischemic leg after the bypass surgery. However, he had significant problems with the arterial grafts which resulted in a markedly decreased left ventricular function. In addition, the patient had numerous (10-12) episodes of ventricular fibrillation requiring cardioversion. He also had to redo several grafts. At 19:00, after having been in the Cardiac Operating Room for over six hours, Dr. Cormack (anesthesiologist) discovered that the vascular add-on case was a critical emergency and convinced Dr. Baribeau to let another vascular surgeon do it. Dr. Patricia Furey was consulted and took the patient to the Operating Room at 20:00. She performed a right femoral-popliteal artery bypass until 02:00. However, too much ischemic time had elapsed and the surgery was unsuccessful. The patient was brought back to the Operating Room the following day for a revision and fasciotomy. Over the ensuing week, there were repeated surgeries before he finally had a right below-the-knee amputation on September 17, 2017. This case was reported and ultimately sent out for an external review performed by Dr. Mark Iafrati, a vascular surgeon in Boston at Tufts Medical Center. Interestingly, an incident report was filed for Brian Barb, an Emergency Room Physician Assistant. Dr. Kathleen Zaffino reviewed the complaint and gave Mr. Barb a zero score. Dr. William Goodman, the Chief Medical Officer,

disagreed and changed the zero to a higher score. An appeal was made to the Chief of Medicine and to the Chief of Staff, who both agreed with Dr. Zaffino. When the case was sent to Dr. Iafrati, Mr. Barb's involvement and potential wrong doing was noted in the case write-up.

22.     The details concerning V.G. are:

A 77 year old retired anesthesiologist with coronary artery disease who had an elective coronary artery bypass graft surgery on September 10, 2014, by Dr. Baribeau. He had the misfortune of being started in the mid-afternoon after Dr. Baribeau had admitted a patient with an acutely ischemic leg. He had significant complications with his grafts, several of which were redone. His ventricular function post-bypass, was markedly reduced to 25% and he required multiple cardioversions (approximately 10) secondary to persistent ventricular fibrillation. It may never be proven, but it is suspected that Dr. Baribeau was rushing through this case because he knew he had an ischemic leg to perform. If he had done the ischemic leg ahead of this elective case, it would have been assuredly cancelled due to the late time. The patient was taken to the ICU at 22:00, but did poorly with low cardiac output and acute renal failure secondary to abdominal compartment syndrome. He was taken back to the Operating Room by Dr. Richard Tomolonis for exploratory abdominal surgery. His abdomen was left open for several days.

23.     The details concerning L.M. are:

A 54 year old man with an ischemic right foot had an angiogram of his lower extremity on December 10, 2015, by Dr. Baribeau. His history was significant for an aorto-

bifemoral bypass in 2013. To gain vascular access, he cannulated the right iliac graft in the mid-abdomen. After the procedure he instructed the ICU Nurse Practitioner to remove the iliac cannula. However, because there is no boney structure to compress the artery, which was also a synthetic graft from a previous surgery, there was massive bleeding into the abdomen and the patient died shortly afterwards. This case was sent out for external review, but the reviewer's opinion was never disclosed to the Medical Executive Committee.

24.     The details concerning T.F. are:

A 23 year old man who had a tricuspid endocarditis. He underwent a tricuspid valve replacement by Dr. Baribeau on May 19, 2016. In the ICU postoperatively, he developed an acute bleed into his abdomen. He received multiple transfusions of packed red blood cells, platelets, and fresh frozen plasma. His abdomen was rapidly expanding and he developed acute renal failure from an abdominal compartment syndrome. After bleeding in the ICU for six hours, he was finally taken back to surgery where a large amount of blood was removed. The bleeding source was located in the liver and believed to be secondary to a 14-gauge needle which had been inserted subcutaneously as a guide for the pain catheters. He required hemodialysis and had a prolonged ICU stay, but eventually recovered.

25.     The details concerning J.A. are:

A 73 year old woman referred from Exeter Hospital Cardiology with aortic stenosis. She was brought to the Cardiac Operating Room by Dr. Baribeau for an aortic valve replacement on September 9, 2016. Dr. Baribeau did not tell the referring cardiologist

that he planned to insert a Sorin Perceval Aortic Valve and that he had only done one case before this one. He did this under the supervision of a proctor (Dr. Reed Quinn) from Boston. During the insertion, he ripped her aorta causing a substantial blood loss and then inserted a conventional aortic valve. Because of the serious complications, the patient did poorly and expired in the ICU two days later on September 11, 2016. The Exeter cardiologist was upset that he was not told that Dr. Baribeau was experimenting with a new valve.

26. The details concerning J.R. are:

A 65 year old man who was non-emergent, but added on late in the afternoon on November 28, 2016, for a coronary artery bypass graft surgery with Dr. Baribeau. The Operating Room staff complained to Jack Anderson (Operating Room Director) that this was too late to start a long case and that Dr. Baribeau had a restriction from the Board of Directors that prohibited him from starting cardiac cases after 15:00. Mr. Anderson was further told that since Dr. Baribeau's modus operundi was to rush through late cases, this patient was at risk for postoperative bleeding, tamponade, and return to surgery in the middle of the night with diminution of ventricular function and possible death. In the Operating Room, Dr. Baribeau ripped the right ventricle resulting in an atrio-ventricular dissociation with bleeding. The patient developed a tamponade and returned to surgery. He subsequently developed right ventricular failure and died two days later. His right ventricular function had been normal pre-operatively. This case was also presented to Dr. Thomas Kleeman, the Chief of Staff at the time. He said that the patient went into the Operating Room a few minutes before 15:00 so it was okay.

27.     The details concerning R.B. are:

A 58 year old man who had a history of a left subclavian arterial occlusion.   He underwent an arteriogram with stent via the left brachial artery on May 11, 2017, by Dr. James Rothstein.   He was discharged but re-admitted the following day with a hematoma and pseudo-aneurysm in the left antecubital fossa.   He was taken to the Operating Room by Dr. Rothstein at 20:00 on May 12, 2017, where the hematoma was evacuated.   He was brought to the Post-Anesthesia Care Unit in stable condition at 21:30.   He became agitated with shortness of breath and somnolence shortly afterwards. Dr. Rothstein was called repeatedly.   He then proceeded to have a cardiac arrest requiring CPR.   During the code, it was noted that his hemoglobin and hematocrit were markedly reduced.   A chest x-ray revealed a large effusion in the left pleural cavity.   He was given blood transfusions and taken to the ICU where he died later that night from a frank rupture of his left subclavian artery caused by the stent placement.   Dr. Rothstein never came back to the hospital that night despite many calls.   He was released from his CMC employment shortly afterwards.

28.     The details concerning M.H. are:

An 83 year old man who had a right video-assisted thoracoscopic pleurodesis procedure on Sunday, October 29, 2017, for a pleural effusion by Dr. Baribeau.   During the operation a major chest vessel was lacerated and eight units of packed red blood cells were administrated rapidly.   However, the bleeding was too brisk and the patient expired in the Operating Room.

29. The details concerning L.E. are:

A 69 year old woman with a history of bicuspid aortic valve and aortic insufficiency had an aortic valve replacement and Bentall procedure on August 29, 2017, with Dr. Baribeau. There was a problem with cannulation of the right femoral vein resulting in bleeding. The left femoral vein was then cannulated while an Operating Room nurse held pressure on the right groin. This cannula was inserted into the superior vena cava for venous return while on cardiopulmonary bypass. Shortly after cardiopulmonary bypass was initiated, the perfusionist noted a markedly low hemoglobin. After transfusion of packed red blood cells, the hemoglobin remained low and more packed red blood cells were transfused. Approximately 20 units of packed red blood cells were transfused on bypass while the abdomen expanded. After the aortic valve was inserted and the aorta closed, it was noted that there was severe aortic insufficiency with one of the prosthetic valves sutured to the sewing ring. This was then repaired which prolonged the cardiopulmonary bypass run. The patient was unable to be weaned from cardiopulmonary bypass and was placed on extracorporeal membrane oxygenation. Bleeding continued and a total of nearly 85 units of packed red blood cells were transfused along with 20 units of fresh frozen plasma and 20 units of platelets. This massive transfusion had New England wide ramifications in the blood bank supply. Factor VII was then ordered and given despite an absolute contraindication while on extracorporeal membrane oxygenation. This resulted in the extracorporeal membrane oxygenation lines and filters to clot immediately and stop functioning. The clotted

extracorporeal membrane oxygenation was explanted and another inserted. Ultimately the patient died on August 30, 2017, in the ICU.

30. The details concerning J.C. are:

A 67 year old man with a history of an ascending aortic aneurysm, severe mitral regurgitation, and markedly decreased left ventricular ejection fraction of 10 to 15%. On November 30, 2017, he had a four vessel coronary artery bypass graft surgery with ascending aorta replacement and mitral valve replacement by Dr. Baribeau. He had a markedly decreased cardiac output postoperatively and died in the ICU shortly afterwards. At the Morbidity and Mortality Conference in January 2018, there was a heated discussion between the cardiologists about why this patient was operated on in the first place. Especially since the heart failure data is clear that replacing the mitral valve for severe mitral regurgitation in patients with low ejection fractions is contraindicated.

31. The details concerning R.B. are:

Coronary artery bypass graft surgery on March 26, 2018 by Dr. Baribeau. The patient developed ST elevations on his EKG intraoperatively. Dr. Baribeau was told repeatedly but claimed that it was air in the coronaries. He subsequently closed the chest and left the Operating Room even though the ST elevations persisted. The patient then developed severe hypotension with markedly decreased left ventricular ejection fraction to 15 to 20%. Dr. Baribeau was called back and immediately re-opened the chest where it was discovered that the left internal mammary artery had no flow. The

left ventricular ejection fraction was now down to 15%.  Right and left sided impellers were placed but the patient expired several days later on March 31, 2018.

32.     Many of these practices have been going on for years.  They collectively add up to millions of dollars of federal Medicare and Medicaid reimbursement funds unlawfully obtained from the United States Government.  The Relator, on behalf of the United States of America, seeks recovery of these funds, and all other relief available under the False Claims Act.

**COUNT I**
**(Violation of 31 U.S.C. § 3729(a)(1)(A))**

33.     The allegations of the preceding paragraphs are incorporated herein by reference.

34.     By the conduct alleged herein, the defendants, and each of them presented, or caused to be filed, with the United States Government claims for Medicare and Medicaid reimbursement funding with knowledge of their falsity, or with grossly negligent or reckless disregard to facts and conditions that would indicate, that said claims were inaccurate or inappropriate and false and caused payments for said claims to be made by the United States Government.

35.     By reason of the violation of 31 U.S.C. § 3729(a)(1) the defendant has knowingly or recklessly damaged the United States Government in an as yet undetermined amount.

## COUNT II
### (Violation of 31 U.S.C. § 3729(a)(1)(B))

36.     The allegations of the preceding paragraphs are incorporated herein by reference.

37.     By the conduct alleged herein, the defendants, and each of them, presented, or caused to be filed, with the United States Government claims for Medicare and Medicaid reimbursement funding with knowledge of their falsity, or with grossly negligent or reckless disregard to facts and conditions that would indicate, that said claims were inaccurate or inappropriate and false and caused payments for said claims to be made by the United States Government.

38.     By reason of the violation of 31 U.S.C. § 3729(a)(2) the defendant has knowingly or recklessly damaged the United States Government in an as yet undetermined amount.

## COUNT III
### (Violation of 31 U.S.C. § 3729(a)(1)(C))

39.     The allegations of the preceding paragraphs are incorporated herein by reference.

40.     The defendants, and each of them, in performing the acts hereinbefore set forth, conspired to defraud the United States Government in violation of 31 U.S.C. § 3729(a)(3) by getting false inflated or fraudulent claims allowed or paid to the damage of the United States Government.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff, United States, ex rel. John Doe, respectfully requests that this Honorable Court:

A.      Enter judgment in favor of the plaintiff;

B.      Award the plaintiff damages, in an amount, presently indeterminable, for the defendant's violations of 31 U.S.C. § 3729(a)(1)(A), (B) and (C);

C.      Treble the sum awarded under prayer (b), pursuant to 31 U.S.C. § 3729(a), in addition to a fine of not less than $5,000.00 and no more than $10,000.00 per violation;

D.      Award the plaintiff his attorney's fees and costs;

E.      Pursuant to 31 U.S.C. § 3730(d), award the Relator not less than 15% of the amounts recovered on behalf of the United States, and not more than 30%; and

F.      Award such other and further relief as is just and equitable.

Respectfully submitted,
JOHN DOE,
By his attorneys,
DOUGLAS, LEONARD &
        GARVEY, P.C.


Date:  June 14, 2018          By:    /s/ Charles G. Douglas, III
                                     Charles G. Douglas, III, NH Bar #669
                                     /s/ Jared J. Bedrick
                                     Jared J. Bedrick, NH Bar #20438
                                     14 South Street, Suite 5
                                     Concord, NH 03301
                                     (603) 224-1988
                                     chuck@nhlawoffice.com